IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

THE AIM GROUP INC. and
GRANITE GROUP INT'L, INC.,
        Plaintiffs,

v.                                          CASE NO.:  3:11cv258/MCR/CJK

CWW, INC. and
RONALD NEWCOMB,
        Defendants.
_____

## REPORT AND RECOMMENDATION

On June 5, 2012, the district court entered an order referring plaintiffs' Motion for Entry of Default (Doc. 58) to the undersigned magistrate judge for a report and recommendation concerning damages to be awarded on the default judgment.

The matter was set for an evidentiary hearing on July 12, 2012, based on affidavits.  The record reflects that Mr. Newcomb was served in this lawsuit at 4188 Hwy 57 N, Ramer, Tennessee 38387 (doc. 7), and that the clerk sent notice of the hearing on plaintiffs' Motion for Default to Mr. Newcomb at that address, which was returned to the court.  (Doc. 67).   During the course of this action, Mr. Newcomb was represented by counsel, who was granted leave to withdraw from representation of Mr. Newcomb on December 27, 2012 (doc. 49), and who informed the court that Mr. Newcomb's mailing address was:  Ronald Newcomb, Post Office Box 1620, Corinth, Mississippi 38834.  (Doc. 50).  A Motion to Compel Production

of Documents was filed on December 17, 2011, which was granted by this court after Mr. Newcomb failed to respond or otherwise oppose the motion.  (Doc. 47).  At that time, the court ordered Mr. Newcomb to produce the requested documents, or be subject to sanctions.  (Doc. 54).  Plaintiffs served Mr. Newcomb with Requests for Admissions by certified mail at the address provided by his attorneys, which were returned as "Undeliverable."  The court gave notice of the hearing on plaintiffs' Motion for Entry of Default Judgment to Mr. Newcomb at his home address where he was originally served with the summons and complaint.  The court concludes that Mr. Newcomb was given adequate notice of this Motion for Entry of Default Judgment, as he was served at the address where he was originally served in this case.  The court also concludes that service of pleadings to a litigant at an address provided by his attorneys to the court is proper and sufficient as a matter of law.

Diversity jurisdiction exists in this case, as the dispute involves an amount in excess of $75,000 and Granite Group International, Inc., has its principal place of business in the Northern District of Florida, Mr. Newcomb is a resident of Tennessee, and the AIM Group  Inc. has its principal place of business in Texas.

Upon default, the well-pleaded allegations of fact in the Second Amended Complaint (doc. 35) are accepted as true.  *See Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987).  As set out in the Second Amended Complaint, the parties entered into a Purchase Agreement where Mr. Newcomb represented that he owned, through CWW, Inc., sixty-five (65) abandoned or sunken barges (the "Barges") located in the Ohio River and the Green River.  Mr. Newcomb further represented that the Barges could be sold as scrap for profit.  Mr. Newcomb further promised that

Granite would have no problem gaining access to property on which the Barges were located, and that he had a substantial inventory of steel to replace any Barges that were missing or stolen.  (Doc. 35, ¶ 9).  These promises were memorialized in the Purchase Agreement.  (Doc. 35, ¶ 10).  Plaintiffs paid $500,000 to Mr. Newcomb upon execution of the Agreement on November 4, 2010, and were obligated to pay another $300,000 within forty-five days of execution of the Agreement.  (Doc. 35 ¶ 10).  Granite Group learned in late November 2010, however, that various barges were not owned by Mr. Newcomb.  Granite decided to attempt to work with Mr. Newcomb to resolve the problem.  (Doc. 35, ¶ 10).  Additional attempts were made to discuss the matter with Mr. Newcomb, who failed to respond to any efforts to resolve the breach of the Agreement as to ownership of the Barges, culminating in a formal letter stating that Mr. Newcomb was in breach of the Agreement.

In addition to the breach of contract claims, the Second Amended Complaint alleges Mr. Newcomb committed fraud because, at the time that he represented that he owned the Barges, he knew that he did not own the Barges, or because his representations were made recklessly without regard for the truthfulness of the representations.  (Doc. 35, ¶¶ 23, 25).  Newcomb further represented that he could obtain access to the Barges from certain landowners "when, in fact, he knew, or should have known that the landowners would not grant permission to enter their property to Granite, CWW, or Newcomb."  Also, Newcomb misrepresented that he could replace the Barges from his own "inventory" if the Barges were missing or stolen.  (Doc. 35, ¶¶ 23, 25).  Plaintiffs alleged that these representations "were material to the transaction and were intended, and did in fact, induce Granite and AIM to rely upon the representations of ownership of the Barges, and the ability to

gain access to, and possession of the Barges." (Doc. 35, ¶ 24). Plaintiffs further alleged that Granite reasonably relied on the representations and entered into the Agreement and, as a result, proximately suffered damages. (Doc. 35, ¶¶ 25-26).

The Requests for Admissions submitted with plaintiffs' Motion for Entry of Default Judgment (doc. 55-1) provide further support for the above allegations. In pertinent part, plaintiffs requested defendants admit the following:

> 8.     On or about November 4, 2010, Ronald Newcomb met with Mark Barati and Bren Hall, Granite's agents and officers, at the Holiday Inn - Evansville Conference Center, 4101 Highway 41 North Evansville, Indiana. At that time, they came to terms on a Purchase Agreement. Granite and CWW executed a written Purchase Agreement (the "Purchase Agreement") at that time. A true and correct copy of the contract is attached hereto as Exhibit A.

> 9.     During the November 4, 2010 meeting, Ronald Newcomb represented that he owned sixty-five (65) barges that could be sold to Granite and that the steel contained in each barge could be removed and sold as scrap for a profit.

> 10.     During the November 4, 2010 meeting, Newcomb further represented that the total tonnage of the Barges ranged from 8,000 to 12,000 tons and that if the tonnage did not ultimately meet the minimum threshold of 8,000 tons, he would replace the missing steel from his existing "inventory" or pay $100 for each missing ton.

> 11.     These representations were material to the transaction reached between the parties.

> At the time of the November 4, 2010 meeting, Ronald Newcomb knew that neither he nor CWW: (a) owned the Barges; (b) that neither he, nor CWW owned barges in his non-existent inventory and that he could not obtain permission from each landowner to enter the property to remove the Barges; and (c) neither he nor CWW had inventory from which he,

or CWW could replace any shortage of steel that was not obtained from salvage of the Barges.[1]

12.     At the time of the November 4, 2010 meeting, Ronald Newcomb intended that the representation that he owned the Barges would be relied upon by Mr. Barati and Ms. Hall.

13.     In fact, Mark Barati and Bren Hall did rely upon the representations made by Ronald Newcomb on November 4, 2010.

14.     Mark Barati and Bren Hall's reliance on the November 4, 2010 representations made by Mr. Newcomb was reasonable and induced them to enter into the Purchase Agreement on behalf of Granite.

16.      Plaintiff performed its obligations under the contract and paid $500,000 to CWW, Inc. upon execution of the Purchase Agreement.

17.      Granite attempted to remove some of the Barges and was prevented by landowners, who informed Granite that it had no right to the Barges, which were owned by the landowners.

18.      In early November, 2010, CWW was placed on written notice of adverse claims to ownership of the Barges and refusal by property owners to allow access and permission to enter their property to remove the Barges.

19.     During November, 2010, Mark Barati attempted to get in touch with Mr. Newcomb at least four times by phone to complain about the fact that numerous Barges were missing or certain landowners claimed they owned the Barges.

20.     Ronald Newcomb did not take Mark Barati's calls because he knew that Mr. Barati would confront him with the fact that neither CWW nor Mr. Newcomb owned the Barges, as represented to Granite.

---

[1] The request was unnumbered.

18.    On December 1, 2010, Mr. Barati forwarded an email he received from Carolyn Stone, whose company was claiming ownership of a number of the Barges.

19.    Mr. Barati forwarded that email to Ron Newcomb and stated:

The following email (see below my email) was received by us from the Attorney for David and Carolyn Stone [Bob Donald]. They are the ones who have already secured property owners permission and so on along the river and removed all of the barges listed on Charts 46 through 59. Your representation of ownership of these barges is in question, not only on these, but all of them. I'm assuming you'll send these over to your attorney to see if she has a response to his citations.

The "the perils of an angry farmer, his trusty shotgun, and his menacing dogs" to which he's referring is most likely related to Dee Barnett's property. According to Carolyn Stone and the locals in Madison, Indiana (Chart 96) he's pulled a gun and fired it off at people interested in pulling out those barges. According to the sheriff, Mr. Bennett is one of the wealthiest residents and benefactors in Madison, and they don't intend to do anything about it. It's their position that those [barges] are on his land, so they are his. So we're going to make one more call to see if we can change that, but if not, those are off the list as well.

I'm also meeting with Darryl and Tim at Smugglers Cove today at Chart 102. They've told me that you don't own those barges and could not have sold them to me. I'll get more information as it relates to that when we meet later.

Others that are missing are at Chart 72 and Chart 91. And as you know, the ones in Old Shawneetown (chart 29) were disallowed by the Mayor and the ones at Chart 20 are on Vulcan's property, and they are claiming ownership of those barges.

It would be an understatement to say that we are quite concerned with the situation at hand, but we are more than willing to work with you towards a solution that makes sense for all of us. (emphasis

supplied).

20.    Mr. Barati attempted to contact Ron Newcomb somewhere between two to four times a day during the first week of December 2010, leaving voice mails informing Newcomb that there were about twenty (20) barges missing, taken, or where access to the Barges was refused by homeowners.

21.    From on or about the first week of December 2010 until late February to early March, 2011, Mr. Newcomb could not be contacted except for one email.

22.    In an email dated December 24, 2010, Mr. Barati formally notified Mr. Newcomb and CWW that they were in breach of Sections 1.4, 2.2, 3.1, 4.1 and 8.1 of the Agreement.

23.    In that December 24, 2010 email, Mr. Barati informed Newcomb of the amount of steel actually recovered from property owners after Granite obtained access and permission to remove these barges.  Mr. Barati received no response to this email.

24.    In an email dated January 6, 2011, Mr. Barati provided Ron Newcomb with a spreadsheet of the barges in dispute and stated that: "Without a response from you to begin a plan of replacement materials, we are left with no choice but to proceed with legal action against you and your company."

25.    CWW's failure to clear any disputed claims of ownership and to obtain permission to remove the Barges from each landowner's property constituted a material breach of the Agreement excusing further performance by Granite under the Agreement.

26.    From November 4, 2010 through mid-to-late December 2010, neither Newcomb nor CWW provided permission by any landowner(s) to gain access to remove the barges.

34.    CWW's failure to clear any disputed claims of ownership and to obtain permission to remove the Barges from each landowner's property

constituted a material breach of the Agreement excusing further performance by Granite under the Agreement.

35.    As a direct and proximate cause of CWW's breaches of the Agreement, Granite has suffered losses under the Agreement, including loss of revenue that it reasonably expected from salvaging steel and selling it on the steel market.

36.    The damages suffered by Granite measure of damages as a result of Ronald Newcomb's fraud is $800,000, and the loss of profits that would have been realized from the sale of the salvaged steel.

37.    In addition, CWW is liable to Granite for:  (a) the $500,000 payment for purchase of the Barges; and (b) damages of $250,000 in costs associated with attempted removal of Barges that were not owned by Mr. Newcomb or CWW.

38.    As a direct and proximate cause of CWW, Inc. and Ronald Newcomb's fraudulent misrepresentations, Granite has suffered losses including loss of revenue that it reasonably expected from salvaging steel and selling it on the steel market.

38.    CWW and Newcomb's representations of ownership of the Barges were intentional or in the alternative, were grossly negligent as their conduct was so reckless or wanting in care that they constituted a conscious disregard or indifference to Granite's rights.  Accordingly, Granite is entitled to an award of punitive damages pursuant to Fla. Stat. 768.72 et. seq. in an amount to be determined.[2]

(Doc. 55-1).

    FEDERAL RULE OF CIVIL PROCEDURE 36(a)(3) provides, in pertinent part, that "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection

_____

[2] The original request was incorrectly numbered.

addressed to the matter and signed by the party or its attorney."  RULE 36(b) provides that "[a] matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."  Mr. Newcomb was served at the address provided by counsel, but failed to serve a response to plaintiffs' Requests for Admissions.  Accordingly, the requests must be deemed admitted for purposes of determining default judgment.

Based on the above, the court finds that default judgment is warranted against Mr. Newcomb and CWW, Inc., for both breach of contract and fraud, and that damages should be awarded to plaintiffs.  The court will focus on fraud damages first.

Plaintiffs presented the Declaration of Mark Barati and further presented documents in support of plaintiffs' lost profits and reliance damages.  Under Florida law, the courts follow the "flexibility theory," which permits the court to use either the "out-of-pocket" or the "benefit of the bargain" rule, depending upon which rule is more likely to fully compensate the victim of fraud.  *See Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462 (11th Cir. 1989) (applying Florida law).  "Either may be used to do justice as the circumstances demand."  *See Nordyne, Inc. v. Fla. Mobile Home Supply, Inc.*, 625 So. 2d 1283, 1286 (Fla. 1st DCA 1993) (*quoting Martin v. Brown*, 566 So. 2d 890, 891 (Fla. 4th DCA 1990)).

Lost profits are recoverable only if their loss is proved with a reasonable degree of certainty.  *See Douglass Fertilizers & Chem., Inc. v. McClung Landscaping, Inc.*, 459 So. 2d 335, 336 (Fla. 5th DCA 1984) (*citing* 17 Fla. Jur. 2d Damages § 76); *see also Lucas Truck Serv. Co. v. Hargrove,* 443 So. 2d 260, 262 (Fla. 1st DCA 1983).  In tort actions, the plaintiff may recover all damages which are a natural, proximate, probable or direct consequence of the act, but do not include remote consequences.

*See Taylor Imported Motors, Inc. v. Smiley,* 143 So. 2d 66, 67-68 (Fla. 2d DCA 1962).

In the instant case, the court should utilize the benefit of the bargain theory, as the plain language of the Agreement, the Second Amended Complaint, and the unrebutted testimony set out in the Declaration of Mark Barati show that Newcomb and CWW, Inc., knew that the steel to be salvaged was to be resold immediately to scrap metal dealers. Newcomb induced Granite to enter into the Purchase Agreement based on representations about Granite's ability to resell the steel as scrap metal at an extremely high profit margin. If his representations had been true, the price of scrap steel was such that Granite, and its joint venture partner, AIM, would have realized over $2.6 million in net profits.

Plaintiffs argue that there are two potential bases upon which this court can award lost profits as a result of defendants' fraud. First, plaintiffs argue that they specifically alleged a "sum certain" in their Second Amended Complaint, where it is alleged that plaintiffs suffered lost profits in excess of $1.7 million. Secondly, plaintiffs rely on the Declaration of Mark Barati, which sets out an evidentiary basis for calculating lost profits amounting to $2,645,394, which was accompanied by detailed evidence supporting their calculation. The court was informed that plaintiffs' earlier calculation of lost profits set out in the Second Amended Complaint was a conservative, preliminary calculation and the subsequent calculation was the result of detailed analysis. The court has broad discretion in awarding lost profits in the context of fraud. Plaintiffs' lost profits calculation satisfies the test for determining lost profits. Alternatively, a default judgment can be entered by the clerk "[i]f the plaintiff's claim is for a sum certain or a sum that can be made certain by

computation . . . ." FED. R. CIV. P. 55(b)(1).  FEDERAL RULE OF CIVIL PROCEDURE 55(b)(2) alternatively provides that in all other cases (where a sum certain is not alleged), the party must apply to the court for a default judgment.  The court concludes that the more conservative lost-profits figure of $1.7 million, as specifically stated in plaintiffs' Second Amended Complaint, is appropriate and adequately compensates plaintiffs for lost profits.  While the prayer for relief requested an amount "in excess of $1.7 million," the stated sum of $1.7 million was expressed as a minimum number and therefore states a "sum certain" under RULE 55(b)(1).

Plaintiffs have established that they suffered significant damages as a result of their reliance on Mr. Newcomb's representations, including $500,000 paid to Mr. Newcomb and CWW, Inc., and the substantial costs of vendors and employees to perform salvage operations for a period dating from November 2010 through July 2011.  (Doc. 64-1, ¶¶ 11, 12; Exhibits A, A-1, A-2, B).  The court should award plaintiffs the $500,000 paid to defendants and $487,606.32—costs incurred in reasonable reliance—for damages incurred as a direct and proximate result of the fraud.

The court should also grant plaintiffs' request for attorney's fees in the amount of $13,390.  Upon review, this amount is fair and reasonable.

Finally, plaintiffs request an award of punitive damages, arguing that Mr. Newcomb's fraud essentially constituted a form of theft, as he took $500,000 from plaintiffs as payment for sixty-five barges with full knowledge that:  (1) he did not own the Barges, (2) did not have the ability to provide access to the Barges; and (3) did not have an inventory of steel in the event that plaintiffs could not salvage the

Barges.  Section 768.73, Florida Statutes, cited for guidance purposes only, provides, in pertinent part, that punitive damages may be awarded if the court finds, by clear and convincing evidence, that the defendant was personally guilty of intentional misconduct or gross negligence.  Intentional misconduct means that the defendant "had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage."  *See* § 768.72(2)(a), Fla. Stat.  Gross negligence means that the "defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety or rights of persons exposed to such conduct."  *See id.* § 768.72(2)(b).

Based on the pleadings of record, including defendants' failure to respond to plaintiffs' Requests for Admission, the court finds that the evidence submitted to the court would support punitive damages under both § 768.72(2)(a) and (2)(b), Florida Statutes.  The intentional act of fraud also supports punitive damages.  The court is frankly unable to assess defendants' ability to satisfy the judgment and pay punitive damages.  Giving this factor due consideration, the court concludes that a substantial punitive damages award should not be imposed.  Nonetheless, the court does find that defendants received $500,000 from plaintiffs on November 4, 2010, which sum represents only a portion of plaintiffs' actual damages.  Because the barges did not belong to defendants, as set out above, this sum could hardly have been used for a legitimate business purpose.  Based on the record before this court, a punitive damages award of 50% of the cash amount received by defendants, $250,000, is an appropriate award of punitive damages in this case.

Under Florida law, plaintiffs are entitled to prejudgment interest dating from the date of the contract, as the fraudulent behavior was nothing more than theft of $500,000 plus lost profits based on plaintiffs' benefit of the bargain. *See Allstate Ins. Co. v. Palterovich*, 653 F. Supp. 2d 1306, 1327-28 (S.D. Fla. 2009); *Greenberg v. Grossman*, 683 So. 2d 156, 157 (Fla. 3d DCA 1996) ("Where there has been a series of civil thefts, prejudgment interest is an element of compensatory damages and should be calculated from the date of each taking." (*citing* § 772.11, Fla. Stat. (1995))).  If, as in this case, there is no contract rate establishing the appropriate interest rate, the interest rate is set annually by the Chief Financial Officer, Florida Department of Financial Affairs.  *See* §§ 687.01 and 55.03, Fla. Stat.   Prejudgment interest should be calculated based on:  (1) the award of $500,000 paid to Newcomb and CWW, Inc., representing the funds fraudulently obtained by Mr. Newcomb and CWW from Granite; and (2) an award $1,700,000 in lost profits dating back to November 4, 2010, the date of the contract.  Thus, taking the sum of the two amounts set out above, prejudgment interest on damages should be awarded at the following interest rates set by the Florida Department of Financial Services (See Exhibit "A"): interest at a rate of 6% dating from November 4, 2010, through September 30, 2011, amounting to $119,704.11 and $81,023.29 at 4.75% dating from October 1, 2011, through July 9, 2012, with per diem interest of $286.30 through the date of judgment. Prejudgment interest is not awarded for attorney's fees or punitive damages.

Accordingly, it is respectfully RECOMMENDED:

1.      That the court enter final judgment in favor of AIM Group Inc. and Granite Group International, Inc., and against Ronald Newcomb and CWW, Inc., jointly and severally.[3]

2.      Plaintiffs should recover $2,463,390 in actual or "reliance" damages and lost profits; $200,727.40 in prejudgment interest from November 4, 2010, through July 9, 2012, $250,000 in punitive damages; $13,390 in attorney's fees, for a total judgment of $2,664,117.40, with per diem of $286.30, through entry of judgment.

DONE AND ORDERED this 31st day of August, 2012.

/s/ Charles J. Kahn, Jr.

CHARLES J. KAHN, JR.
UNITED STATES MAGISTRATE JUDGE

---

[3] Although the recommended judgment is based upon damages shown under the theory of fraud, plaintiffs alternatively seek recovery of damages for breach of contract. Breach of contract claims are, under Florida law, separate and independent from claims alleging fraud. *See Ashland Oil, Inc. v. Pickard*, 269 So. 2d 714, 720 (Fla. 3d DCA 1972). "A right of action on a contract and for fraud in inducing plaintiff to enter into such contract may exist at the same time, and a recovery on one of the causes will not bar a subsequent action on the other." *Id.* at 723 (*quoting* 50 C.J.S. Judgments § 676, p. 121 (1st ed. 1947)). To recover damages for lost profits in a breach of contract action, a party must prove a breach of contract, that the party actually sustained a loss as a proximate result of that breach, that the loss was or should have been within the reasonable contemplation of the parties, and that the loss alleged was not remote, contingent, or conjectural and the damages were reasonably certain. *See Frenz Enters., Inc. v. Port Everglades*, 746 So. 2d 498, 504 (Fla. 4th DCA 1998). The damages for breach of contract overlap, in part, with the damages awarded for fraud. Accordingly, the undersigned would alternatively find that plaintiffs are entitled to damages for breach of contract equivalent to $500,000 paid to defendants, $487,606.32 in losses from attempted salvage operations, and $1,700,000 in lost profits, in addition to prejudgment interest and attorney's fees for the same reasons set out above.

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).

lorida Department of Financial Services

## EXHIBIT "A"



Florida Department of Financial Services
**STATUTORY INTEREST RATES**
**PURSUANT TO SECTION 55.03, FLORIDA STATUTES**

Chapter 2011-169, Laws of Florida, amended Section 55.03(1), Florida Statutes, to require the Chief Financial Officer to set the rate of interest that shall be payable on judgments and decrees on December 1, March 1, June 1, and September 1 of each year for the following applicable quarter. Sections 215.422(3)(b), 337.141(3) and 687.01, Florida Statutes, requires the use of interest at the rate established in Section 55.03(1), Florida Statutes, for the payment of interest applicable to the late payments to vendors for goods and services purchased by the State; for late payments on applicable construction or maintenance contracts administered by the Department of Transportation; and for cases where a rate of interest is not specified in a contract. The interest rate for payments to health care providers pursuant to Section 215.3422(13), Florida Statutes, remains at 1% per month or .0003333 per day.

## Interest Rates Established Quarterly under Chapter 2011-169, Laws of Florida:

| Effective Date | Rate Per Annum | Daily Rate as a Percentage | Daily Rate as a Decimal |
|---|---|---|---|
| October 1, 2011 | 4.75% | .0130137% | .000130137 |
| January 1, 2012 | 4.75% | .0129781%(¹) | .000129781(¹) |
| April 1, 2012 | 4.75% | .0129781%(¹) | .000129781(¹) |
| July 1, 2012 | 4.75% | .0129781%(¹) | .000129781(¹) |

(¹) Note: The daily rate for quarters beginning in 2012, considers that 2012 is a leap year, and is calculated by dividing the annual rate by 366 days.

## Interest Rates Prior to Chapter 2011-169, Laws of Florida:

| Year | Rate Per Annum | Daily Rate as a Percentage | Daily Rate as a Decimal |
|---|---|---|---|
| 1/1/2011-9/30/11(²) | 6% | .01644% | .0001644 |
| 2010 | 6% | .01644% | .0001644 |
| 2009 | 8% | .02192% | .0002192 |
| 2008 | 11% | .03014% | .0003014 |
| 2007 | 11% | .03014% | .0003014 |
| 2006 | 9% | .02466% | .0002466 |
| 2005 | 7% | .01918% | .0001918 |
| 2004 | 7% | .01918% | .0001918 |
| 2003 | 6% | .01644% | .0001644 |
| 2002 | 9% | .02466% | .0002466 |
| 2001 | 11% | .03014% | .0003014 |
| 2000 | 10% | .02740% | .0002740 |
| 1999 | 10% | .02740% | .0002740 |
| 1998 | 10% | .02740% | .0002740 |
| 1997 | 10% | .02740% | .0002740 |
| 1996 | 10% | .02740% | .0002740 |
| 1996 | 10% | .02740% | .0002740 |
| 1995 | 8% | .02192% | .0002192 |
| 10/1/81-12/31/94 | 12% | .03333% | .0003333 |

(²) Note: The January 1, 2011 interest rate was established prior to the law change under Chapter 2011-169, Laws of Florida. After July 1, 2011, interest rates will be established quarterly by the CFO.

Effective July 1, 2011, the CFO sets the interest rate on December 1, March 1, June 1, and September 1 of each year and publishes it in the Florida Administrative Weekly at least once prior to the rate becoming effective. Please call the Vendor Ombudsman Section within the Bureau of Accounting at (850) 413-5516 if additional information is needed.

- 2011 © Florida Department of Financial Services
- Division of Accounting and Auditing, 200 East Gaines Street, Tallahassee, FL 32399-0353

*Case No: 3:11cv258/MCR/CJK*